OPTICAL DISC CORPORATION,
Plaintiff,

v.

DEL MAR AVIONICS, Defendants.

No. CV 97–00650 MRP.

United States District Court,
C.D. California,
Western Division.

July 27, 2001.

Karl A Sandoval, Graham & James, Costa Mesa, CA, James A McQueen, Brian Edward Bisol, Stephen J Koundakjian, McQueen & Ashman, Irvine, CA, for Optical Disc Corporation, plaintiff.

Douglas C Rawles, Brobeck Phleger & Harrison, Los Angeles, CA, William E Trautman, Craig Y Allison, Brobeck Phleger & Harrison, San Francisco, CA, Jonathan D Baker, Brobeck Phleger & Harrison, Palo Alto, CA, for Del Mar Avionics, a Calif corp, Bruce Del Mar, an individual, Does, 1 through 100 inclusive, Toolex Intern, NV, Toolex USA, Inc., defendants.

## MEMORANDUM OF DECISION– CORRECTED VERSION (7:4— "1992" TO "1993")

PFAELZER, District Judge.

On January 9, 2001, Del Mar Avionics ("Del Mar") filed three motions pertaining to U.S. Patent No. 5,297,129 ("the '129 patent"): Summary Adjudication of Invalidity for Failure to Disclose Best Mode, Summary Adjudication of Invalidity on the

Ground of On–Sale Bar, and Summary Adjudication of Invalidity of Claims 21 and 24 of the Patent. On February 26, 2001, the Court heard oral argument and took the matters under submission.

## INTRODUCTION

Optical Disc Corporation ("ODC") and Del Mar are competitors in the field of compact disc mastering technology. ODC brought this action against Del Mar for patent infringement and related state law claims. ODC alleges, *inter alia,* that Del Mar's FireTrac mastering system, used in the manufacture of compact discs, infringes most claims of the '129 patent.

The '129 patent covers certain aspects of optical recording, a process involving the storage of information onto a light sensitive medium. Specifically, the claims of the '129 patent are directed toward the heart of a CD/DVD mastering system: the laser write signal used to store information on the optical medium.

In laser mastering, digital information is stored in the form of pits on the surface of the CD master. In the thermal dye polymer process, the mastering process used by both ODC and Del Mar, the mastering system uses a laser to make small pits in the dye polymer layer of a CD master. In the prior art, it took some time for the laser to heat up, resulting in uneven vaporization of the dye polymer layer at the leading edge of each pit. The result would be a slow ramp down to the point at which the laser reached its maximum effectiveness. When a pit was complete, a modulator would remove the laser from the surface of the CD master, resulting in a steep edge, which was markedly different from the ramped leading edge caused by the slow heating.

Because greater control and adjustability can be achieved by increasing the symmetry of the leading and trailing edge of the pits, Wilkinson et al. developed a pro-

cess based on the so-called "Trapezoid Signal": a signal by which the trailing edge undergoes a slow upward ramping before the laser beam is removed from the pit (thus leading to a more trapezoidal topography for the pits recorded on the CD master). They filed the application that led to the '129 patent on December 24, 1991.

## ANALYSIS

**I. Del Mar's Motion for Summary Adjudication of Invalidity of U.S. Patent No. 5,297,129 for Failure to Disclose Best Mode.**

35 U.S.C. § 112, ¶ 1 requires that an inventor set forth in his specification "the best mode contemplated by the inventor of carrying out his invention." Failure to discharge this statutory obligation to disclose to the public the known preferred embodiment of an invention renders invalid the protection that a patentee seeks as the benefit derived from such disclosure. *See Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1210 (Fed.Cir.1991).

Analyzing whether a patent should be held invalid for this type of statutory violation involves a two-part inquiry: 1) whether the inventor actually possessed a best mode for practicing his invention at the time of filing; and 2) whether the patent's specification provides an adequate written description so as to allow one skilled in the art to practice this best mode. *See Eli Lilly & Co. v. Barr Labs., Inc.,* 222 F.3d 973, 980–81 (Fed.Cir.2000).

The putative "best mode" highlighted in the present Motion is a waveshaping signal known commercially as "CDRET." CDRET is a variant of ODC's patented Trapezoid Signal, and thus reveals the same characteristic ramped trailing edge as seen on this signal. In addition to the ramped trailing edge, however, a signal

that embodies the CDRET waveshape also begins, on its leading edge, with a high intensity overshoot that quickly drops to a lower intensity level. This overshoot, followed by what is mathematically described as exponential decay, allows for an even greater ability to adjust and tailor the shape of the pits in a recordable disc medium. (Wilkinson Depo. at 383:2–7).

▊ Both documents and testimony support Del Mar's assertion that the ODC '129 patent is invalid for its inventors having failed to disclose the inclusion of the CDRET modifications as part of their best mode. There is already no dispute that the '129 patent lacks a disclosure that specifically states that combining a high-intensity overshoot followed by exponential decay with the trapezoid signal was the best mode contemplated by the inventors. The evidence also shows that there is no factual dispute that, at filing, the inventors considered CDRET to be the best way to practice their invention.

### A. The Specification Did Not Adequately Disclose the Addition of the CDRET Leading Edge Modifications as the Best Mode for Practicing the Claimed Invention of the '129 Patent.

As ODC has already admitted that the patent does not specifically disclose that combining CDRET leading edge modifications with the trapezoid waveshape is the best mode of practicing the invention, the Court's analysis is simplified. Nevertheless, ODC attempts to circumvent the inventors' omission by arguing 1) that CDRET merely means the cooperative modification of the leading and trailing edges, a concept already inherent . in the '129 specification, and 2) that the patent specification contains more than enough disclosure to allow anyone of ordinary skill in the art to practice CDRET.

In support of its contention, ODC offers the declaration of Dennis Howe, who opines that the combination of the leading edge modifications with the trapezoid signal, while not explicitly disclosed in the specification, would nonetheless have been obvious to one of ordinary skill in the art. Obviousness, however, has nothing to do with a best mode inquiry, in which the issue is whether the patentee *disclosed* his best mode *as* his best mode. Without some kind of disclosure (explicit or implicit), obviousness is not enough.

An informative case on this issue is *Chemcast Corp. v. Arco Indust. Corp.,* 913 F.2d 923, 928–30 (Fed.Cir.1990), in which the Court of Appeals for the Federal Circuit emphasized that if a specification does not explicitly disclose the best mode for practicing the claimed invention, the patentee must implicitly disclose it in light of the level of skill in the art. According to the Court, this "implicit disclosure" is inadequate where "skilled practitioners could neither have known what [the inventor's] contemplated best mode was nor have carried it out." *Id.* at 930.

Even if the Court were to agree with ODC in its contention that the possibility of modifying the leading edge to include an overshoot followed by exponential decay was something that would have already been well within the knowledge and ability of one of ordinary skill in the art, such knowledge and ability would be overshadowed by the fact that a person of ordinary skill would not have known that this particular combination of the non-claimed leading edge modifications with the claimed trailing edge modifications would be the best way to practice the invention. Indeed, as in *Chemcast* (where the patentee had explicitly disclosed a number of construction materials but had failed to point out which one was the best material to use), if one of ordinary skill were asked

to find and practice the inventors' best mode of practicing the invention of the '129 patent, she "would not even [know] where to look." *Id.* at 928.

Thus, even if the Court were to find both that the CDRET concept was inherent in the specification and that the CDRET modifications could have been carried out by one of ordinary skill in the art, the specification would still be found to have not adequately disclosed that such modifications were part of the inventors' best mode.

**B. The Inventors Did Contemplate the Basic CDRET Concept as the Best Mode for Implementing the Trapezoid Signal Waveshape.**

█ Richard Wilkinson, president of ODC and a named inventor on the '129 patent, testified at deposition that he came up with the idea of combining a high intensity overshoot with exponential decay on the leading edge of the signal waveshape with his previous trailing edge modifications "probably around mid–1992." (Wilkinson Depo. at 382:20–383:1) He also testified that ODC performed experiments during 1992 to confirm that adding this leading edge modification to the Trapezoid Signal would be effective in creating a better product. (Wilkinson Depo. at 384:2–5) According to Wilkinson, ODC concluded, *in the last half of 1992,* that it would create a better product. (Wilkinson Depo. at 383:18–384:1)

Other ODC documents also support his deposition testimony:

- Nov. 24, 1992—Inventor Shigang prepares a detailed schematic that shows an implementation of the new waveshape. (Shigang Decl. ¶ 4, Exh. 1)
- Dec. 2, 1992—Shigang submits an engineering order to modify a board to incorporate "additional RC decayed tip to 'laser on' pulse." (Rawles Decl. Exh. 20) Shigang now characterizes

this Work Order as "proposing that a Rev F AOM piggyback board be modified to include this leading edge adjustment." (Shigang Decl. ¶ 5)

- Dec. 16–18, 1992—Wilkinson's laboratory notebook shows the new waveshape and compares tests done on the "std. wave shape." (Rawles Supp. Decl. Exh 25 at ODC78135)
- Dec. 17–18, 1992—Engineer Waddell's trip report shows installation and testing of the new waveshape board at a customer site (Specialty Records) on these dates (Rawles supp. Decl. Exh. 26)
- Dec. 18, 1992—A block diagram is prepared that incorporates blocks for controlling slope, amplitude, and overshoot-tip/amplitude ratio of the laser write signal. (Rawles Decl. Exh. 20 at ODC74091; Exh. 21 at ODC74096)
- Dec. 22, 1992—Engineer Golding submits work order to implement new waveshaping board, indicating that one purpose was to "[i]mplement the latest method of waveshaping circuitry." (Rawles Decl., Exh. 20 at ODC74088–89)
- Jan. 6, 1993—Less than two weeks after having filed the application that later became the '129 patent, ODC approves formal schematics for the new waveshape board.

While the testimony and documentary evidence is consistent and overwhelming, ODC attempts to avoid summary adjudication by talismanic reliance on ODC's then-current Product Development Policy, which supposedly required that beta testing be completed prior to widespread commercial distribution of product advancements. In support of its position, ODC submits a new declaration from Wilkinson, in which he not only describes ODC's 1990 Product Development Policy (the existence for which he offers no material support),

but also directly contradicts his prior deposition testimony by stating, among other things, that he is now certain that he was not able to determine if CDRET worked in practice until after December 30, 1992.

As Wilkinson has provided no foundation for his representations regarding ODC's 1990 Product Development Policy, the Court could exclude those portions of his declaration that discuss the details and implementation of this policy, including all references to beta testing. *See* FED. R. EVID. 402, 802, 602, and 1002. However, since the existence of this corporate policy is of minimal importance to a best mode inquiry, the Court finds exclusion unnecessary.[1]

With respect to Wilkinson's other self-serving statements, those that contradict his prior deposition admissions, the Court gives them no credence. *See* FED. R. CIV. P. 56(e). Wilkinson's explanation that his prior deposition was not a "memory test" and that his memory has since been "enhanced" by his reexamination of already produced documents is not sufficient to explain away Wilkinson's having made such admissions in the first place. Wilkinson was never forced to provide in his deposition answers dates for which he was uncertain. Without establishing why he made such admissions at deposition, he cannot turn back the clock merely by claiming to now have a better recollection. Because Wilkinson has not shown that his contradictory declaration statements "were the result of an honest discrepancy, a mis-

take, or the result of newly discovered evidence," the Court finds his testimony to be "a sham produced merely to avoid summary judgment." *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir.1991). *See also* FED. R. CIV. P. 56(e). As such, it cannot be used to create a genuine issue of fact. *See Allied Mutual*, 952 F.2d at 267.

While not relied upon for the Court's holding, Wilkinson's late-produced February 1993 letter to Specialty Records (Rawles 2nd Supp. Decl. Exh. 38 at ODC83884–87) confirms what has been made clear by the other testimony and documents: the inventors determined *before* the date of filing that the new CDRET waveshape created a better result. On December 17, 1992, ODC engineer Waddell installed the CDRET board at Specialty Records. The board installed was the product of "[a]n extensive R & D project [that] was conducted at ODC [that] resulted in a relatively simple electronic modification of the recorder." (*Id.* at ODC83885.) What was intended to be a three-day testing period at Specialty Records instead took three weeks, this due to a problem with the CD analyzers—*not* the CDRET board. (*Id.* at ODC83885.) Most telling, Wilkinson's letter reveals that even ODC considered beta testing to be a process separate and distinct from R & D, one to be undertaken *after* the completion of R & D:

> This technology was extensively tested by recording numerous masters on mul-

---

1. Beta testing is not the impediment ODC makes it seem. Beta testing is simply the field testing a product undergoes after it has been decided that it is a viable product—beta testing works out bugs, it is not a prerequisite to a determination that the product will work. (*Cf.* Rawles 2nd Supp. Decl. Exh. 38 at ODC83884–87.) Whether or not ODC had completed all of the beta testing required to perfect their *commercial implementation* of what later was called CDRET has no bearing

on whether the inventors contemplated the new waveshape to be the best mode of practicing the invention for which they filed an application on Dec. 24, 1992. *See Acme Resin Corp. v. Ashland Oil, Inc.*, 20 U.S.P.Q.2d 1305, 1312, 1991 WL 274498 (S.D.Ohio 1991), aff'd 954 F.2d 735, 1992 WL 14350 (Fed.Cir.1992) (holding that a company's ultimate approval of a product is irrelevant to a determination of what the inventor knew at the time of filing).

tiple recorders at ODC and having them replicated in a large number of molding machines at Specialty, Allied, and other ODC customers. *I am concerned that the extended time required to install this at Specialty is being interpreted as ODC conducting R & D at Specialty's facility. This interpretation is entirely without foundation. All R & D was completed at ODC,* and sample discs were mastered at ODC and molded at Specialty prior to Specialty's approval and request that this technology be installed on Specialty's recorders as soon as possible.

Id. (emphasis added).

The testimony and documents clearly show that the inventors, at filing, contemplated the inclusion of leading edge modifications as the better way of implementing the Trapezoid Signal. ODC may not have had the boards perfected and ready for commercial shipment, but the inventors already had tested the new design and contemplated that this modification would be incorporated into the next generation signal.

## CONCLUSION

All before filing, the inventors had conceived of combining the leading edge modification to the Trapezoid Signal. They had created detailed schematics; they had designed, installed, and tested a board made according to the schematics; and they had advanced to less than two weeks from making a concrete corporate commitment to implement the new waveshape in their next generation of products. However, because they did not adequately disclose this combination as the best mode of practicing their invention, the Court GRANTS Del Mar's Motion for Summary Adjudication of Invalidity for Failure to Disclose the Best Mode. The Court denies defendant's other two motions as moot.

Because the only claim arising under federal law is ODC's patent infringement claim, the Court declines to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367. The state law claims and counterclaims are dismissed without prejudice.